## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| FEDERICO SANTA CRUZ, |
| Plaintiff, |
| v. |
| JOHN W. SNOW, |
| Defendant. |

Civil Action 01-1364 (HHK)

## MEMORANDUM OPINION AND ORDER

Plaintiff, Federico Santa Cruz, brings this action against his employer, the Department of the Treasury ("Treasury"), alleging that Treasury discriminated against him on the basis of race, national origin, and age, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and retaliated against him for complaining about the discriminatory conduct.[1] Presently before the court is Treasury's motion for summary judgment [#29]. Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that the motion must be granted.

## I. BACKGROUND

Santa Cruz, a 67 year-old Filipino man, is employed by the Bureau of Engraving and Printing ("BEP"), a division of the Department of the Treasury, as a GM 13 Supervisory

---

[1]     In addition to these causes of action, Santa Cruz originally alleged the torts of negligent hiring and supervision and intentional interference with a current and prospective employment relationship.  The parties stipulated to the dismissal of these claims on February 7, 2002.

Chemical Engineer.[2]   Santa Cruz began working for BEP in 1988, "performing chemical engineering functions . . . related to the manufacture of ink[,] printing of currency and other security methods," Santa Cruz Dep. at 15.   In 1991, Santa Cruz received a promotion and served as branch head of the Chemical Engineering Branch.   BEP apparently eliminated this branch in 1996 and that same year transferred Santa Cruz to the Office of Engineering, Environmental and Energy Management Division ("the Division").   Upon his transfer, Santa Cruz's primary responsibilities became identifying and recommending energy and water conservation projects, tracking annual energy and water consumption at BEP, and preparing an annual report for Treasury.   Once at the Division, Santa Cruz came under the direct supervision of Mark Pipkin.

Antagonism between the two men developed within a few months of Santa Cruz's arrival. Santa Cruz filed a formal Equal Employment Opportunity ("EEO") complaint on March 18, 1997.  *See* Def.'s Mot. for Summ. J., Ex. 5 at 1-4.   In his EEO complaint, Santa Cruz detailed some 25 individual discriminatory acts occurring over the course of eight years.[3]   Among other charges, Santa Cruz accused Pipkin of:  reminding him on November 7, 1996, "[r]emember now, there is no more Chemical Engineering Branch," *id*. at 16; telling Santa Cruz on November 19,

---

[2]         Santa Cruz is identified elsewhere as a "GS-13 professional series employee," *see, e.g.*, Def.'s Mot. for Summ. J., Ex. 19 at 1.  This discrepancy in pay scale is immaterial to the present discussion.

[3]         Although the overwhelming majority of the events Santa Cruz identified in his EEO complaint allegedly occurred in 1995-96, he lists discriminatory acts dating back to the beginning of his employment with Treasury in 1988.  At that time, Henry Toney (then the Chief of the Office of Applied Research and Technical Services, later to become Santa Cruz's first-line supervisor in the Division) allegedly negotiated a specific salary with Santa Cruz and later reneged on his offer.  Def.'s Mot. for Summ. J., Ex. 15 at 24-25.  In addition to Pipkin and Toney, the EEO complaint alleged that four other employees – Melvin Jacob, Jeffrey Van Houten, Dave Williams, and Lillian Cates – discriminated against Santa Cruz on the basis of race and national origin.  *Id*. at 8-25.

1996 that "we have bad experience [sic] with Chemical Engineers," *id*.; accelerating the deadline

for completion of a project, *id*. at 15; on November 20, 1996, giving Santa Cruz an assignment

"on a note scribbled on a 3" x 5" yellow Post It sheet," which in Santa Cruz's view was "not the

proper way to initiate an engineering project," *id*. at 14; distributing a document to Santa Cruz on

the same date, with the comments that "[i]f you cannot understand it verbally, I will read it to

you," and "[s]ince you cannot take it verbally, I will have it for you in writing," *id*.; in December

1996, preparing a 1997 Performance Plan for Santa Cruz that allegedly reduced the scope of his

job duties, *id*. at 9; and, in the course of a December 4, 1996 meeting concerning the 1997

Performance Plan, using a "loud and demeaning voice," banging on Santa Cruz's office door,

and generally treating Santa Cruz with a lack of respect, *id*. at 8.

The 1997 Performance Plan became a source of ongoing conflict between Santa Cruz and

Pipkin.  On April 28, 1997, Jeffrey Van Houten, then Santa Cruz's second-line supervisor, wrote

to Santa Cruz that "[t]he fact that you disagreed with the standards and refused to sign them does

not mean they are not in effect.  Performance standards, like assignments of work, are not a

negotiable issue."  Def.'s Mot. for Summ. J., Ex. 33.  Van Houten explained that "it is Bureau

policy to conduct both an annual performance evaluation and a mid-year performance review

based on your performance in achieving or meeting these standards."  *Id*.

Two days later, Pipkin conducted a Mid-Year Performance Review with Santa Cruz.

Pipkin noted that "Mr. Santa Cruz is not achieving the standards outlined in his performance

plan," and criticized Santa Cruz's failure to complete assignments in a timely manner, to work

with others in the Division, and to provide updates on his activities.  Pl.'s Opp'n, Ex. 19.  The

next day, on May 1, 1997, Pipkin wrote to Santa Cruz that "[a]s discussed at your mid-year

review on 4/30/97, you are not achieving the standards outlined in your performance plan, and your performance is bordering being [sic] unacceptable.  As a result of this less than satisfactory performance, you are being officially notified that unless your performance improves, you will be placed on a performance improvement plan."  Def.'s Mot. for Summ. J., Ex. 48.  Santa Cruz ultimately had his Final Year 1997 Performance Review in November 1997 and received a rating of "achieved standards" in all categories.  Pl.'s Opp'n, Ex. 20 at 2.  Also in November 1997, Santa Cruz requested that BEP fund a course at George Washington University; Pipkin authorized the course, but Santa Cruz's second-line supervisor at the time, George Shue, did not.

Friction between Santa Cruz and Pipkin worsened in 1998.  On January 14, 1998, Pipkin apparently tasked Santa Cruz to work on BEP standards.  *See* Def.'s Mot. for Summ. J., Ex. 18. Two days later, Santa Cruz wrote a memorandum to Pipkin asking that the supervisor supply "a copy of the procedures and criteria that you will use in reviewing the BEP standards that I am writing," and noting that "[i]t would be a waste of U.S. Taxpayer money if I spend time developing the procedures and criteria for writing BEP standards because you have them already."  *Id*.  Santa Cruz also mentioned that "standards are very highly technical documents. The reviewer must have a level of competence in standards development and on the subject of the standard which are at least equal to that of the originator, preferably higher."  *Id*. (emphasis omitted).  Santa Cruz sent copies of this memo to Shue and two other BEP managers, Carla Kidwell, the Associate Director of Technology, and Thomas Kidwell, the Deputy Director.

Pipkin replied to Santa Cruz in a memo dated January 21, 1998 that "it is your responsibility to provide this information as part of your assignment," and that "[t]he level of oversight and direction required by you on assignments of this nature is far too extensive for an

4

employee at the GS-13 level." *Id*., Ex. 19 at 1.  Pipkin noted Santa Cruz's dissatisfaction with his "current work situation" and requested that he not circulate memoranda "to parties outside this office without first receiving my concurrence." *Id*. at 2.

Pipkin called Santa Cruz to the former's office the next day, on January 22, 1998, furnishing his memorandum to Santa Cruz and asking to discuss its contents.  After an argument over whether the men would have the meeting by themselves or with Shue present, Santa Cruz departed and returned to his own office.  Pipkin allegedly followed Santa Cruz back to the latter's desk; according to Santa Cruz, his supervisor "stood very close to me . . . trying to stare me down and intimidate me," and "spoke with hatred," *Id*., Ex. 20 at 1.  Pipkin left Santa Cruz's office, and apparently returned later in the day to notify Santa Cruz that they would meet with Shue on January 29, 1998.  During this second encounter, Santa Cruz noted that Pipkin screamed at him.

On January 26, 1998, Santa Cruz wrote to Shue, Kidwell, Ferguson, and Jean Pitts, the Chief of the Office of EEO/Employee Counseling, requesting a "transfer to another BEP component" due to allegedly discriminatory acts perpetrated by Pipkin.  *Id*., Ex. 21 at 1.  Three days later, Santa Cruz wrote another memorandum to Shue, Kidwell, Ferguson, and Pitts, repeating his request for a transfer and his allegations that Pipkin had consistently discriminated against him.  As scheduled, Santa Cruz met with Pipkin and Shue on January 29, 1998.  Shue testified that "we were in agreement to transfer [Santa Cruz] to some other part of the organization," but that Santa Cruz never followed up on the proposal. *Id*. at 57.  At the meeting, Shue also suggested that to "get over [the] hump," Pipkin list the tasks he had already assigned to

Santa Cruz, "and give that list to [Santa Cruz] with the target dates for completion . . . so that it's very clear to [Santa Cruz] what is expected of him." *Id*. at 68, 66-67.

On the same day as his meeting with Pipkin and Shue, Santa Cruz wrote to Shue that "[i]n the meeting on January 29, 1998, you gave the direction that I should stop work on the development of standards. In accordance with your directions, I have stopped working on the development of standards immediately." Pl.'s Opp'n, Ex. 28. In response, Shue wrote to Santa Cruz that "obviously you misunderstood my instructions to continue working on the assignments given to you by Mr. Pipkin . . . you are to continue working on the assignments that Mr. Pipkin has given you and outlined in his 2/2/98 memorandum." *Id*., Ex. 29.

Meanwhile, Santa Cruz had written to Pipkin on January 30, 1998 that "you will give me a list of tasks and I will comment/work on these tasks . . . . In order to be able to follow this schedule it is necessary that I receive at least one task a day from Feb. 3, 4, 5, 6, 9, 10, and 11 at the beginning of each working day . . . . If the list of tasks is submitted late, the number of tasks evaluated will be reduced accordingly." Def.'s Mot. for Summ. J., Ex. 25. As apparently agreed at the January 29, 1998 meeting, Pipkin then provided Santa Cruz with a list of three tasks and corresponding deadlines: the development of "energy efficient standards or guidance for use in writing engineering specifications," due February 9, 1998; "a comprehensive energy tracking plan with initiatives and milestones for reducing energy costs, improving energy efficiency, and energy consumption," due February 25, 1998; and "a formal reporting format for energy expenditures that can be incorporated into [the] quarterly environmental reports," due March 9, 1998. *Id*., Ex. 27 at 1. In Pipkin's view, Santa Cruz turned in only an incomplete version of the

first assignment; on March 5, 1998, Pipkin wrote that "you are not adhering to the mutually

agreed upon terms of our meeting with Mr. Shue." *Id.*, Ex. 28 at 2.

On March 9, 1998, Pipkin presented Santa Cruz with a Memorandum of Warning, noting

"serious deficiencies" in Santa Cruz's conduct and outlining expectations for Santa Cruz's

workplace performance and demeanor.  Pl.'s Opp'n, Ex. 2.  Pipkin wrote a "memorandum for

file" indicating that on April 1, 1998, he asked Santa Cruz about the status of his work

assignments, stated that he felt Santa Cruz was spending too much time on one particular issue

area, and reminded him "about the original focus of his work."  Def.'s Mot. for Summ. J., Ex. 29.

Santa Cruz, by Pipkin's telling, "became angry when I asked to see draft documents of his work,"

and "muttered something and abruptly left" Pipkin's office.  *Id.*

Tensions between Santa Cruz and Pipkin continued to escalate in early 1998.  During a

staff meeting held on April 23, 1998, conflict between the men flared again.  Pipkin stated that

Santa Cruz "starting yelling at and verbally attacking" Mohamud Saleh, a co-worker, and "shook

[his] fists at [Saleh] while screaming that he is unqualified for his position."  Pl.'s Opp'n, Ex. 6

at 1.  Santa Cruz, for his part, denied screaming and shaking his fists at Saleh, but testified that

Pipkin talked to him "in a very stern and angry and belligerent manner," Santa Cruz Dep. at 70,

after Santa Cruz offered a clarification about BEP's recycling program.  Prompted by Santa

Cruz's alleged misbehavior at the April 23, 1998 staff meeting, Pipkin decided to suspend Santa

Cruz without pay for five days.  Pipkin indicated that the suspension was also based on Santa

Cruz's failure to remedy the problems outlined in the March 9, 1998 Memorandum of Warning,

and failure to complete the assigned tasks Pipkin had conveyed to him in the January 29, 1998

meeting and through the February 2, 1998 memorandum.  Several months later, on October 2,

1998, Santa Cruz sent Pipkin a memorandum requesting that "a BEP employee other than yourself or George Shue" perform his year-end evaluation, because "you have a college degree but it is not in Engineering.  Therefore, you cannot even make an evaluation of my performance because the tasks I am doing are engineering in nature."  Def.'s Mot. for Summ. J., Ex. 45 at 1. On October 22-23, 1998, Santa Cruz again received a rating of "achieved standards" on his Final Year 1998 Performance Review, an evaluation to which he again objected.  *Id*., Ex. 41.

In 1999, Henry Toney became Santa Cruz's first-line supervisor.  On the basis of the available record, several years passed without incident.  Santa Cruz received his formal right-to-sue notice regarding his initial EEO complaint on April 6, 2001, and filed this suit on June 20, 2001.  Several months later, though, BEP initiated a second round of disciplinary action against Santa Cruz with a Letter of Warning on August 23, 2001.  According to Toney, there were two bases for the warning: "creating a disturbance, and failure to follow orders."  Pl.'s Opp'n, Ex. 13 at 1.

The next summer, Toney asked Santa Cruz to perform billing reconciliation, but Santa Cruz purportedly "refused to complete the task and gave invalid reasons why [he] could not validate the procedure by performing the task" that Toney had directed him to complete.  *Id*., Ex. 14 at 1.  On this basis, Toney issued Santa Cruz a Notice of Proposed Suspension on June 25, 2002, indicating that Santa Cruz would be suspended for three days for failure to follow supervisory instructions.  Santa Cruz filed a grievance based on his suspension on July 29, 2002.

## II. ANALYSIS

### A. Plaintiff's Disparate Treatment Claims[4]

*1. Framework*

Title VII makes it unlawful for an employer to discriminate against an individual on the basis of race, national origin, or sex.  42 U.S.C. § 2000e-2(a).  ADEA prohibits an employer from failing to hire an individual on the basis of an individual's age, 29 U.S.C. § 623(a)(1), a protection applying to workers 40 years of age and older.  *Id*. § 631(a).  Santa Cruz's claims under both statutes require analysis under the ubiquitous burden-shifting framework first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *see also Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077-78 (D.C. Cir. 1999) (applying *McDonnell Douglas* factors to ADEA claims).  Under this approach, the plaintiff bears the burden of making a *prima facie* case of discrimination by bringing forth facts sufficient "to create a reasonable inference" that the plaintiff's status as a member of a protected class, such as race or age, "was a factor in the employment decision at issue."  *Krodel v. Young,* 748 F.2d 701, 705 (D.C. Cir. 1984).  If the plaintiff successfully meets this burden, he creates a rebuttable presumption that the defendant

---

[4] The standard for summary judgment is familiar.  Under Fed. R. Civ. P. 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  Material facts are those "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986).  The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor.  *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249-50.

employer unlawfully discriminated against him.  *Teneyck v. Omni Shoreham Hotel*, 365 F.3d

1139, 1151 (D.C. Cir. 2004) (citation omitted).  The burden then passes to the defendant to

articulate a "legitimate, nondiscriminatory reason" for its actions.  *McDonnell Douglas*, 411 U.S.

at 802.  Once the defendant has done so, "the ultimate question . . . is whether intentional

discrimination may be inferred from all of the evidence before the trier of fact."  *Teneyck*, 365

F.3d at 1151.  Such evidence includes the plaintiff's *prima facie* case, any evidence the plaintiff

presents to rebut the employer's assertedly non-discriminatory rationale for its actions, and "any

further evidence of discrimination that may be available to the plaintiff."  *Id*. (citations omitted).

To establish a *prima facie* case of disparate treatment discrimination, the plaintiff must

show:  (1) that he is a member of a protected class; (2) that he suffered an adverse employment

action; and (3) that he was treated differently than similarly situated employees who are not part

of the protected class.  *See id.*; *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999).  The parties

do not dispute that as a Filipino man over age 40, Santa Cruz is a member of a protected class

under both Title VII and ADEA, satisfying the first element of his *prima facie* case.

An "adverse employment action" is "a significant change in employment status, such as

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing significant change in benefits."  *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir.

2003) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  While economic

harm is not a prerequisite, it is the typical injury flowing from an adverse employment action.

*See Dickerson v. SecTek, Inc.,* 238 F. Supp. 2d 66, 80 (D.D.C. 2003); *see also Russell v. Principi*,

257 F.3d 815, 818 (D.C. Cir. 2001) ("while adverse employment actions extend beyond readily

quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action" (citations omitted)).

Santa Cruz alleges six different incidents in support of his claim of disparate treatment: a warning letter issued on March 9, 1998, Compl. ¶ 57, Pl.'s Opp'n at 3-6, 10-12; a similar warning letter issued on August 23, 2001, *id.* at 3-6, 14-16; a Notice of Proposed Suspension issued on May 21, 1998, Compl. ¶¶ 37, 57, Pl.'s Opp'n at 3-6, 12-14; a second Notice of Proposed Suspension issued on June 25, 2002, *id.* at 3-6, 16-17; purportedly substandard performance evaluations in 1996-97 and 1997-98, Compl. ¶¶ 18-21, 32, 34, Pl.'s Opp'n at 6-7, 22-24; and denial of his 1997 request to attend a George Washington University course, *id.* at 5-6, 20-22.  The court evaluates each of these claimed discriminatory acts individually.

*2. March 9, 1998 Memorandum of Warning*

On March 9, 1998, Pipkin presented Santa Cruz with a Memorandum of Warning, noting "serious deficiencies" in Santa Cruz's conduct.  Pl.'s Opp'n, Ex. 2 at 1 ("March 9, 1998 Memorandum of Warning").  Pipkin wrote:

> [Y]ou are currently displaying a number of behaviors that are very inappropriate.  Among other things, you display a hostile and contentious attitude with the staff and me; you often delay or fail to follow my directions; you write an inordinate number of superfluous memoranda to others and me that are often inflammatory; and, you often fail to carry out your assigned duties in an effective manner or within prescribed parameters.  This list of shortcomings is not exhaustive . . .

*Id.*

Pipkin directed Santa Cruz to keep his office door open, "unless warranted by business necessity"; to "execute my instructions as directed and without delay"; "to complete assigned duties in a timely and thorough manner"; to work with others "in a pleasant and business-like

manner"; and to seek any needed clarification of work instructions. *Id*. at 1-2.  Pipkin also advised Santa Cruz that "failure to heed these warnings may result in administrative action being taking against you, including the possibility of removal from your position." *Id*. at 2 (emphasis omitted).

Santa Cruz argues that this warning letter constitutes an adverse employment action because it was "closely connected with [his] subsequent suspension, which Defendant does not contend is not an adverse employment action." Pl.'s Opp'n at 11.  A mere warning of possible future disciplinary action, however, does not constitute an independent adverse employment action simply because the employer later followed through on the warning. *Bunyon v. Henderson*, 206 F. Supp. 2d 28, 30 (D.D.C. 2002).  Rather, to be considered an adverse employment action, the warning must *itself* affect the terms, conditions, or privileges of Santa Cruz's employment. *Harris v. Potter*, 310 F. Supp. 2d 18, 21 (D.D.C. 2004).  Santa Cruz does not allege that the March 9, 1998 Memorandum of Warning cost him pay or benefits, effected a change to his job title or responsibilities, altered his work hours, or otherwise affected "any material matter" of his employment.  Although Santa Cruz speculates that "it is conceivable that [his] warnings could be placed in his personnel file to be reviewed in connection with applications for future promotions, thereby affecting his grade and salary," Pl.'s Opp'n at 11, this possibility is too attenuated to create the requisite "adversity" needed for Santa Cruz's *prima facie* case.  Santa Cruz does not argue that he was actually denied a promotion on the basis of the warning letter, or even that he sought any promotion after the issuance of the warning.

Consequently, Santa Cruz's discrimination claim based on the March 9, 1998 Memorandum of Warning is dismissed.[5]

### 3. August 23, 2001 Letter of Warning

Santa Cruz received the second notice of warning several years later from another supervisor, Henry Toney. Toney issued the August 23, 2001 Letter of Warning for two stated reasons. First, Toney wrote that Santa Cruz was "unprofessional and disrespectful" during an August 7, 2001 meeting on the office's FY 2002 Annual Energy Report. At the meeting, Santa Cruz allegedly admonished Toney that the "Secretary of the Treasury does not tolerate documents being late that require his signature," and that "if the energy report were late, it would be [Toney's] fault" since Toney had specified the procedures for obtaining copies of the utilities invoices necessary for the preparation of the report. Pl.'s Opp'n, Ex. 13 at 1. Toney wrote to Santa Cruz that "I do not have a problem with you disagreeing with me on office issues and procedures; however, once a decision is made, I expect you to follow the guidance that is issued." *Id*. As a second ground for the warning, Toney wrote that after he asked Santa Cruz to prepare a spreadsheet showing BEP's utilities usage, Santa Cruz replied that he was "too busy" to

---

[5]     Santa Cruz's statement that he "has produced ample evidence" that BEP's rationale for the warning letters is pretextual, "assuming expert testimony shows the existence of an adverse employment action," Pl.'s Opp'n at 11, mischaracterizes his burden at this stage of the proceedings. Santa Cruz must demonstrate the existence of an adverse employment action now, not during the putative trial, to proceed with this claim. It is also unexplained what role *expert* testimony would have in establishing that the March 9, 1998 Memorandum of Warning adversely affected Santa Cruz. Although not required, expert testimony in a Title VII case is generally offered to prove a plaintiff's damages. *See Thomas v. Mineta*, 310 F. Supp. 2d 198, 208 (D.D.C. 2004). While expert testimony might be introduced to establish liability as well, a plaintiff's intention to introduce such testimony does not obviate the requirements of making a *prima facie* case in order to survive summary judgment.

perform the task, and that doing so would delay his completion of other assignments. *Id*. at 1.

Toney indicated that the warning would not be filed in Santa Cruz's Official Personnel Folder,

but "will be retained in the Division files" for a period of one year. *Id*. at 2.

Santa Cruz offers no argument that the August 23 2001 Letter of Warning materially

affected his pay, benefits, responsibilities, or working conditions. Consequently, he has not

shown that the letter constituted an adverse employment action. *See Walker v. Wash. Metro.*

*Area Transit Auth.,* 102 F. Supp. 2d 24, 29 (D.D.C. 2000) (disciplinary notice "did not constitute

an adverse personnel action because it affected neither the appellant's grade nor his salary.")

(discussing *Brown*, 199 F.3d at 458). For the same reasons that his claim based on the March 9,

1998 Memorandum of Warning fails, his claim based on the second warning must also be

dismissed.[6]

### 4. May 21, 1998 Notice of Proposed Suspension

On May 21, 1998, Pipkin presented Santa Cruz with a Notice of Proposed Suspension.

Pipkin indicated that he intended to suspend Santa Cruz without pay for five days on three

grounds: creating a disturbance at the April 23, 1998 staff meeting; failure to follow orders; and

failure to complete assigned duties. Pl.'s Opp'n, Ex. 6 at 1. On the first charge, Pipkin stated

that Santa Cruz "displayed an [sic] extremely hostile, loud, and confrontational behavior" when

he began "verbally attacking" a co-worker during the staff meeting. *Id*. Santa Cruz allegedly

"shook [his] fists at the person while screaming that he is unqualified for his position, that he did

---

[6]     Santa Cruz's argument that the warnings might be placed in his file and cloud his prospects for future promotion, a speculative proposition at best, carries even less weight with the August 23, 2001 letter, which Toney specifically noted would not be placed in Santa Cruz's official personnel file. *See* Pl.'s Opp'n, Ex. 13 at 1.

not know what he was talking about, and that he was therefore wasting the government's money." *Id*.  As to Santa Cruz's apparent failure to follow orders, Pipkin noted that his March 9, 1998 Memorandum of Warning cautioned Santa Cruz to work with "customers, colleagues, and management in a pleasant and business-like manner," and that Santa Cruz failed to follow this exhortation.  Pipkin wrote in the Notice of Proposed Suspension that Santa Cruz "continued to write a large volume of inflammatory memoranda that describe [his] perceptions of mismanagement." *Id*.  Finally, Pipkin stated that he had "repeatedly counseled" Santa Cruz "about the need to complete assigned duties in a timely manner," to no avail.  *Id*. at 2.  Pipkin noted that pursuant to their meeting of January 29, 1998, he had assigned Santa Cruz three projects, all due between February 9 and March 9, 1998, and that at the time of the suspension notice Santa Cruz had not completed any of three.  *Id*.

It is undisputed that the five-day unpaid suspension constituted an adverse employment action.  Treasury relies on the three reasons stated in the Notice of Proposed Suspension to supply its assertedly legitimate, non-discriminatory reason for the suspension – Santa Cruz's inappropriate behavior at the April 23, 1998 staff meeting, his failure to follow his supervisor's orders, and his failure to completed assigned tasks.

In attempting to show that Treasury's claimed reasons are really a pretext for unlawful discrimination, Santa Cruz challenges Pipkin's characterization of the April 23, 1998 staff meeting.  Santa Cruz asserts that he a shoulder injury left him physically unable to shake his fists.[7]  Santa Cruz Dep. at 71-72.  He also "question[s] the sincerity behind the suspension," Pl.'s

---

[7]        Santa Cruz admits that he told Saleh "you don't know what you're talking about."  Santa Cruz Dep. at 71.

Opp'n at 13, because Saleh and another co-worker, Ricardo Lopez-Merced, both sent

memoranda to Pipkin complaining about Santa Cruz's behavior at the staff meeting. *See id.*,

Exs. 7 and 8.  Because both letters were dated on the same day, April 28, 1998, and because

Pipkin testified that "it's possible" that he requested that Saleh and Lopez-Merced write letters

regarding the alleged incident, Pipkin Dep. at 210, Santa Cruz concludes that Pipkin acted out of

"discriminatory animus."  Pl.'s Opp'n at 13.  Conspicuously absent from Santa Cruz's argument,

though, is a connection between Pipkin's purported orchestration of the complaint letters and any

impermissible motivation.  Even if Pipkin sought to "set up" Santa Cruz, as Santa Cruz claims,

such a maneuver is not actionable under Title VII or ADEA absent a demonstration that race,

nationality, or age prompted Pipkin's actions.  Santa Cruz offers no evidence on this account.

Santa Cruz does not dispute the other two bases for the May 21, 1998 Notice of Proposed

Suspension – failure to follow orders and failure to complete assigned duties.  His only challenge

is to argue that in the aftermath of the January 29, 1998 meeting held between Santa Cruz,

Pipkin, and Shue to discuss Santa Cruz's work projects, Shue incorrectly claimed that Santa Cruz

wrote to him that he had "stopped work on all of his assignments." *Id.*, Ex. 27.  Santa Cruz in

fact wrote to Shue that "[i]n accordance with your directions, I have stopped working on the

development of standards immediately." *Id.*, Ex. 28.  Shue replied that "I did not instruct you to

stop work on any assignments given previously by Mr. Pipkin . . . you are to continue working on

the assignments that Mr. Pipkin has given you and outlined in his 2/2/98 memorandum." *Id.*, Ex.

29.  Santa Cruz's point is irrelevant, because the Notice of Proposed Suspension was based on

Santa Cruz's failure to complete three specific projects Pipkin assigned to him, not on Santa

16

Cruz's stopping work "on all of his assignments."[8]  Because Santa Cruz has not offered even a

shred of evidence that Treasury's reasons for imposing the five-day suspension on him in 1998

were a cover for unlawful discrimination, the court dismisses this claim.

### 5. June 25, 2002 Notice of Proposed Suspension

Toney issued Santa Cruz the June 25, 2002 Notice of Proposed Suspension on the ground

that Santa Cruz failed to follow Toney's supervisory instructions with regard to two matters.

First, Santa Cruz allegedly refused to complete a task Toney assigned to him, a comparison of

utility billings with actual steam usage.  According to Toney, after being asked to perform this

assignment Santa Cruz "refused to complete the task and gave invalid reasons" why he could not

do so.  *Id.*, Ex. 14 at 1.  Toney also charged Santa Cruz with contravening instructions provided

to him regarding information distribution, stating that Santa Cruz took a letter to James Sirinakis,

Toney's first-line supervisor, "without discussing the letter with [Toney] first" and apparently

telling Toney by way of explanation "that [Toney] did not have any right to the information."  *Id.*

---

[8]        Santa Cruz argues, unconvincingly, that Pipkin's stated reasons for giving Santa
Cruz the suspension must be discounted because "Pipkin was untruthful about his educational
achievements."  Pl.'s Opp'n at 12.  Pipkin first answered "yes" in response to a question about
whether he had a college degree, and shortly thereafter corrected himself and testified that he was
short a course requirement and had not been issued a degree.  Pipkin Dep. at 16, 18-19.  Santa
Cruz also claims that Treasury's rationale must be pretextual because Pipkin testified that he had
no independent recollection of the details of his conflict with Santa Cruz, some six years before.
*Id*. at 197-200.  Santa Cruz also attempts to defeat Treasury's stated reasons for disciplining him
by arguing that "Shue could not even get his dates correct as to when he received [Santa Cruz's]
memo allegedly indicating that [Santa Cruz] had stopped work on all assignments."  Pl.'s Opp'n
at 14.  Shue testified that he probably read a specific memo Santa Cruz wrote on February 3,
1998, rather than on January 30, 1998 as he had written at the time.  Shue Dep. at 92-93.  The
desperation of these arguments underscores the total absence of any real evidence of race,
national origin, or age-based discrimination in Santa Cruz's submissions.

As with the May 21, 1998 Notice of Proposed Suspension, Santa Cruz does not deny the substance of these charges.  Instead, he asserts that Toney "conveniently could not remember any of these alleged invalid reasons during his deposition."  Pl.'s Opp'n at 16.  Toney, when asked about "what the invalid reasons are" that Santa Cruz apparently offered for his refusal to complete the project, testified that "I can't remember exactly.  But he did not perform the task.  That's the bottom line."  Toney Dep. at 88.  Santa Cruz again seems to misunderstand the nature of the showing he must make to avoid summary judgment for Treasury.  It is insufficient for him to assert that in his view, Treasury's actions against him were imprudent or unfair; an employer may make an employment decision for "a good reason, a bad reason, or no reason at all so long as racial or other discriminatory distinctions do not influence the decision."  *Winston v. Smithsonian Sci. Info. Exch.*, 437 F. Supp. 456, 473 (D.D.C. 1977) (citations omitted).  At most, Santa Cruz has adduced evidence that his supervisors are forgetful, ornery, or petty, but these qualities alone – absent evidence of unlawful discrimination – do not give rise to liability.

Santa Cruz also argues that with respect to his second suspension, a white co-worker, Donald O'Connor, "was repeatedly allowed to verbally abuse his co-workers and his supervisor, destroy property and skip work, yet he received no more than a 'good talking to,'" while Treasury "'threw the book'" at Santa Cruz.  Pl.'s Opp'n at 19.  Santa Cruz thus seeks to establish that his employer discriminated against him because a colleague outside of Santa Cruz's protected class allegedly committed more serious infractions, but was disciplined less severely.  Evidence that similarly situated employees outside the plaintiff's protected class were treated more favorably allows the plaintiff to establish a *prima facie* case of discrimination.  *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999).  In evaluating whether the plaintiff and the relevant co-worker are

18

similarly situated, "[t]he nature of the offenses committed and the punishments imposed are the most significant variables in a case alleging discrimination in connection with disciplinary actions." *Childs-Pierce v. Util. Workers Union of Am.*, __ F. Supp. 2d __, 2005 WL 1983577 at *7 (D.D.C. Aug. 10, 2005) (citing *Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985) (internal citation omitted); *Holbrook*, 196 F.3d at 261).

Santa Cruz does not establish that he was "similarly situated" to O'Connor.  Santa Cruz received the June 25, 2002 Notice of Proposed Suspension for failure to follow supervisory instructions.  O'Connor, in contrast, apparently had an "anger problem," Pl.'s Opp'n at 18, and according to the testimony of Saleh, "always used to yell at the manager," Saleh Dep. at 86, screamed at Saleh, and kicked the shelf of a desk.  *Id*. at 60-61.  O'Connor also allegedly arrived at work "any time he wants," *id*. at 84, and possibly slept during working hours, *id*. at 87-88. Employees are not similarly situated when their workplace problems are, as here, "entirely different." *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (female employee terminated for difficulty in meeting deadlines and "getting along with others" not similarly situated to male co-worker who had trouble with "legal writing abilities and [a] tendency to stretch work out"); *see also Phillips v. Holladay Property Servs., Inc.*, 937 F. Supp. 32, 36-37 (D.D.C. 1996) (white employee who arrived at work late not "similarly situated" to black colleague fired for insubordination); *Kidane v. Northwest Airlines, Inc.*, 41 F. Supp. 2d 12, 17 n.8 (D.D.C. 1999) (employees not similarly situated where plaintiff offered no evidence that "they had the same history of disciplinary problems.").  Because Santa Cruz was not similarly situated to O'Connor, he cannot use alleged disparities between Treasury's approach to the two men's alleged misconduct to support his discrimination claims.

*6. 1997 and 1998 Performance Evaluations*

In most circumstances, "performance evaluations alone at the satisfactory level or above should not be considered adverse employment actions."  *Russell*, 257 F.3d at 819; *see also Hussain v. Principi*, 344 F. Supp. 2d 86, 106 (D.D.C. 2004) (the fact that a plaintiff "receives a lower performance evaluation than [he] thought [he] deserved does not constitute adverse action" sufficient to make a *prima facie* case of discrimination).  Even performance evaluations that are "unequivocally negative" are "not necessarily adverse actions" when they do not affect the plaintiff's salary, benefits, work duties, or other material conditions of employment.  *Id.* (quoting *Brown*, 199 F.3d at 458 (internal quotation marks omitted)).

Santa Cruz asserts discrimination claims with regard to three specific evaluations:  his Mid-Year Performance Review for 1997, dated April 30, 1997, and his Final Year Performance Reviews for 1997 and 1998.  On Santa Cruz's 1997 mid-year evaluation, Pipkin noted that:

> Mr. Santa Cruz is not achieving the standards outlined in his performance plan.  Mr. Santa Cruz has been given numerous assignments and has not completed them in a timely or successful manner.  Mr. Santa Cruz does not provide updates on his assignments, does not attend scheduled meetings, and must be constantly reminded and asked about the status of his project activities.  Mr. Santa Cruz continues to stay locked in his office and does not participate with others in the Division.  Mr. Santa Cruz needs to take initiative and to be more pro-active in his approach towards his assignments and energy management.  This includes conducting energy assessments and recommending other environmental/energy related initiatives for production sections, facilities projects, and equipment acquisitions . . .

Pl.'s Opp'n, Ex. 19.

The evaluation form asks each evaluated employee to "reflect on your efforts during the rating period" and to "express any issues of a professional or personal nature that are pertinent to your performance during this rating period."  In the space reserved for employee comments,

Pipkin apparently wrote "Employee Refused to Contribute," and on the signature line noted that Santa Cruz refused to sign the evaluation. *Id*. Santa Cruz's Final Year 1997 Performance Review indicates that he received a rating of "achieved standards" in all categories. Pipkin wrote that "Mr. Santa Cruz has minimally achieved the standards outlined in his performance plan and met the reporting deadlines for the energy reporting requirements. [He] needs to use more initiative," and "needs to conduct energy audits and more aggressive reviews of energy conservation initiatives." *Id*., Ex. 20 at 2. Santa Cruz also received a rating of "achieved standards" in all categories of his Final Year 1998 Performance Review, and Pipkin wrote that "[a]fter a tepid start and the issuance of a letter of warning, Mr. Santa Cruz provided clear, consistent information regarding his energy assignments." Def.'s Mot. for Summ. J., Ex. 41 at 2. Santa Cruz noted his disagreement with both final year evaluations, and on the 1998 evaluation wrote that he was suspended without pay "based on false allegations," and that "I deserve the highest rating because Mark Pipkin does not have the education, training and experience to understand what I am doing. I have been initiating all my work." *Id*.

Santa Cruz seeks to withstand Treasury's summary judgment motion while deferring for another day his obligation to establish a *prima facie* case of discrimination. He argues that he "must engage in expert discovery in order to show that his performance evaluations negatively impacted the terms of his employment, including, but not limited to any promotions for which he has applied and been rejected." Pl.'s Opp'n at 22. Hypothetical expert testimony in the future, however, cannot substitute for a showing at the present moment that the performance evaluations actually had negative consequences for Santa Cruz. "Although the evaluations were perhaps not all that [he] hoped they would be," there is no evidence that they were "adverse in an 'absolute

sense.'" *Lester v. Natsios*, 290 F. Supp. 2d 11, 29 (D.D.C. 2003).  Santa Cruz's statement that as

a general matter "the most important indicator of a federal employee's performance is his annual

evaluation, determining his promotions within grade and his suitability for grade advancement,"

Compl. ¶ 18, does not create a genuine issue of material fact with respect to the performance

evaluations.  Because he "did not present evidence suggesting that [he] suffered any 'significant

change in [his] employment status'" due to the performance reviews, *Taylor*, 350 F.3d at 1293,

Santa Cruz's claim based on these evaluations must be dismissed.

*7. January 1998 Denial of Funding for University Course*

Denial of a training opportunity on allegedly discriminatory grounds can constitute an

adverse employment action, *Freedman v. MCI Telecommunications Corp.*, 255 F.3d 840, 845

(D.C. Cir. 2001), but only if the denial materially affects the plaintiff's pay, hours, job title,

responsibilities, promotional opportunities, and the like, *Hoffman v. Caterpillar, Inc.*, 256 F.3d

568, 574 (7th Cir. 2001) (citations omitted).

In this case, Santa Cruz sought approval for BEP funding for a self-study course at

George Washington University, "Advanced Reading and Research."  Def.'s Mot. for Summ. J.,

Ex. 38 at 2.  As Santa Cruz explained in his proposal, "[i]n this course, the student develops a

course of study on the subject of concentration," and meets with an adviser regularly throughout

the semester to discuss the student's progress.  Santa Cruz's chosen topic was "The Engineering

Organization of Energy Efficiency and Water Conservation in a Printing Facility."  *Id*. at 2.  On

November 19, 1996, Pipkin authorized this course, which cost just over $2,100.  *Id*. at 1.  The

following year, Santa Cruz sought to enroll in the same course at George Washington University,

this time with the goal of "develop[ing] an engineering procedure to determine energy

consumption changes," *Id.*, Ex. 39.  Although Pipkin approved this request on November 26, 1997, *id.*, Santa Cruz's then-second-line supervisor, George Shue, apparently did not.  On January 13, 1998, Shue wrote to Santa Cruz that he was denying the course approval request because he was "unable to see any benefits to the Bureau's mission from your project paper." Pl.'s Opp'n, Ex. 18.

Rather than explain how BEP's refusal to pay for a second university self-study course adversely affected his grade, salary, work responsibilities, promotional opportunities, or other material conditions of his employment, Santa Cruz merely asserts that "this issue is not ripe for decision because expert testimony has not been developed yet, which *may show* that denial of the course opportunity resulted in [Santa Cruz] not getting his PHD [sic], which thereby *might have an affect*" on his employment.  Pl.'s Opp'n at 21 (emphases added).  Yet again, Santa Cruz is flatly wrong that he need not make the required *prima facie* showing of an adverse employment action at the summary judgment stage and may instead postpone this requirement until trial.[9] Because Santa Cruz fails to show any legally cognizable adversity flowing from the denial of the course, this discrimination claim cannot be sustained.  *Lester*, 290 F. Supp. 2d at 27, 29; *see also Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407 (5th Cir. 1999) (plaintiff failed to produce evidence that denial of training opportunity "peripheral" to hear primary job duties would "tend to affect" her employment status or benefits).

---

[9]      Santa Cruz's apparent conviction that expert testimony will provide a panacea for his case is perplexing; whether he relies on expert witnesses, fact witnesses, his own testimony, or documentary evidence, he must still show that every employment action giving rise to his complaint actually resulted in adverse consequences for him.

**B.  Plaintiff's Hostile Work Environment Claim**

A hostile work environment exists "when workplace conditions are so suffused with 'discriminatory intimidation, ridicule and insult' of such severity or pervasiveness as to alter the conditions of the victim's employment." *Hussain*, 344 F. Supp. 2d at 107 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993) (other internal quotation marks omitted)).  To establish a viable claim, a plaintiff must show not only that he experienced harassment in the workplace, but that such harassment arose because of the plaintiff's race (or here, national origin or age). *Ware v. Billington*, 344 F. Supp. 2d 63, 71 n.1 (D.D.C. 2004) (citing *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002)). In determining whether the plaintiff has satisfied this requirement, the court must consider all relevant circumstances, including the frequency and severity of the conduct at issue, "whether it is physically threatening or humiliating, or a mere offensive utterance," and whether the alleged abuse "unreasonably interferes with an employee's work performance." *Curry v. District of Columbia,* 195 F.3d 654, 663 (D.C. Cir. 1999) (citing *Harris*, 510 U.S. at 23).  In this Circuit, "casual or isolated manifestations of a discriminatory environment" do not provide a sufficient basis for a hostile work environment claim.  *Park v. Howard University,* 71 F.3d 904, 906 (D.C. Cir. 1995).

Santa Cruz bases his hostile work environment claim on a number of incidents, most notably:  Pipkin allegedly spitting on Santa Cruz during a heated exchange in late 1997 or early 1998, Santa Cruz Dep. at 145-47; Pipkin "stalk[ing]" Santa Cruz and "star[ing] at [him] for long periods of time," Pl.'s Opp'n, Ex. 23 at 26; Pipkin and others questioning Santa Cruz's handwriting and English language comprehension, Def.'s Mot. for Summ. J., Ex. 5 at 10, 14; Pipkin encouraging co-workers to "ridicule and criticize" Santa Cruz, Pl.'s Opp'n at 26;

24

Pipkin replying "aha, another Filipino" after Santa Cruz identified a colleague at the April 23, 1998 staff meeting, *id.*, Ex. 23 at 27; Pipkin telling Santa Cruz at the same meeting "you will see what will happen" when Santa Cruz asked that a colleague stop interrupting him, *id.*; a comment made in 1996 by another BEP manager who said that "all Filipinos that I know are happy-go-lucky," Santa Cruz Dep. at 141-42; and Toney "scold[ing] [Santa Cruz] like a child, referencing [his] apparent need for a babysitter."  Pl.'s Opp'n, Ex. 23 at 16.

While Santa Cruz has undoubtedly come forward with sufficient evidence to prove to a near certainty that BEP is an unpleasant and contentious workplace environment for him, he fails to establish that he was subjected to an *unlawful* hostile work environment because of his race, national origin, or age.  Only two of the numerous incidents Santa Cruz cites bear even the slightest trace of reference to race.  While the statements attributed to Pipkin ("aha, another Filipino") and Williams ("all Filipinos are happy-go-lucky") might be ignorant or offensive, these comments are "simply insufficiently severe" or pervasive "to create an abusive working environment." *Glovinsky v. Cohen*, 983 F. Supp. 1, 4 (D.D.C. 1997); *see also Harris,* 500 U.S. at 21 (noting that the "mere utterance of an . . . epithet which engenders offensive feelings in an employee . . . does not sufficiently affect the conditions of employment to implicate Title VII") (citation and internal quotation marks omitted).  Because Santa Cruz has failed to meet his burden, the court grants summary judgment for Treasury on the hostile workplace claim.[10]

---

[10]     In his complaint, Santa Cruz alleged that Treasury retaliated against him for "exercising his rights as a federal worker to complain of discriminatory behavior and his right to have his performance reviewed by unbiased agency individuals."  Compl. ¶ 56.  In order to establish a *prima facie* case of retaliation under Title VII, Santa Cruz must show that: (1) he engaged in a statutorily protected activity; (2) Treasury took an adverse personnel action against him; and (3) a causal connection exists between the two.  *Brown*, 199 F.3d at 452-53.  Santa Cruz drops the retaliation claim in his opposition to Treasury's summary judgment motion.

**III. CONCLUSION**

For the foregoing reasons, the court concludes that Treasury's motion for summary

judgment must be granted.  An appropriate order accompanies this memorandum opinion.


Henry H. Kennedy, Jr.
United States District Judge

Dated: September 6, 2005